**21 WEST, INC., et al., Appellants/Cross–Respondents,**

v.

**MEADOWGREEN TRAILS, INC., et al., Respondents/Cross–Appellants.**

No. 65978.

Missouri Court of Appeals,
Eastern District,
Division Three.

Dec. 5, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 17, 1996.

Application to Transfer Denied
Feb. 20, 1996.

Michael F. Roche, Thomas Cummings, Armstrong, Teasdale, Schlafly, Davis & Dicus, St. Louis, for Appellants/Cross–Respondents.

John L. Gianoulakis, Lori J. Baskins, Kohn, Shands, Elber, Gianoulakis & Giljum, St. Louis, for Respondents/Cross–Appellants.

GARY M. GAERTNER, Judge.

Appellants/cross-respondents 21 West, Inc., Joseph Layton, Carol Layton, William Rice, Green Valley Construction Co., Inc., Glaco, Inc., Summerhedge Development Co., Inc., and Mican Homes, Inc., appeal the March 4, 1994, judgment of the Circuit Court of St. Louis County entered after a trial in equity of actions for breach of contract, unjust enrichment, contempt, dissolution of a corporation, misappropriation of corporate funds, breach of corporate directors' fiduciary duties, intentional interference with business expectancies, trespass, and imposition of vendor's liens. Respondents/cross-appellants Meadowgreen Trails, Inc., John Gorse, and Beulah Ann Gorse also appeal aspects of the judgment. We affirm as modified in part and dismiss without prejudice in part.

## I.

### SUMMARY OF PARTIES AND POINTS ON APPEAL

The parties fall into two opposing camps. Appellants/cross-respondents, denominated the "Layton/Rice Parties" by the trial court, are Joseph ("Joe") Layton, his wife Carol

Layton, William ("Bill") Rice, 21 West, Inc. ("21 West"), Green Valley Construction Co., Inc. ("Green Valley"), Glaco, Inc. ("Glaco"), Summerhedge Development Co., Inc. ("Summerhedge"), and Mican Homes, Inc. ("Mican"). Respondents/cross-appellants, or the "Meadowgreen Parties," consist of Meadowgreen Trails, Inc. ("Meadowgreen"), John Gorse, and his wife Beulah Ann ("Ann") Gorse.

The corporations involved in this action, their shareholders, and the percentage of shares each shareholder holds are summarized as follows:

21 West: Joe and Carol Layton—all shares

Summerhedge: Joe and Carol Layton—all shares

Green Valley: Joe Layton, Bill Rice, and John Gorse—one third each

Glaco: Joe and Carol Layton—one third; John and Ann Gorse—one third; Bill and Carol Rice—one third

Mican: Joe and Carol Layton—one half; Bill and Carol Rice—one half

Meadowgreen: John and Ann Gorse—one half; Joe and Carol Layton—one half

The litigation underlying this appeal began on January 17, 1989, and ultimately encompassed five causes of action. These actions were consolidated and tried in equity late in 1993. The trial court entered judgment on March 4, 1994, by means of a Court Order and Decree. No findings of fact were issued. Various post-trial motions were filed; all were denied. The parties' appeals followed.

The Layton/Rice Parties claim the following on appeal:

1. The trial court erred in finding for Meadowgreen and against Green Valley on Meadowgreen's claim of breach of contract for the sale of Lilac Ridge lots 71–73, 75–80, 82–84, 92, and 93;

2. The court erred in finding for the Meadowgreen Parties on their unjust enrichment claim;

3. The court erred in entering a contempt award of $358,753.89 against Joe Layton, Carol Layton, Bill Rice, Green Valley and Mican;

4. The court erred in finding for the Meadowgreen Parties on their claim of intentional interference with business expectancy;

5. The court erred in offsetting the recovery due Joe and Carol Layton as shareholders in Meadowgreen against the recovery due the Meadowgreen Parties on their claims of intentional interference with business expectancy, trespass, and breach of fiduciary duty and violation of RSMo § 351.400;[1]

6. The court erred in its judgment for the Meadowgreen Parties on their claims of breach of contract, unjust enrichment, misappropriation of $75,000, and breach of fiduciary duty and violation of RSMo § 351.400, because either John and Ann Gorse, or Meadowgreen, lacked standing; and

7. The court erred in imposing vendor's liens on lots 19–26 of Summerhedge Subdivision and on lots 63, 65, 72, 73, 75–78, 80, 82–84, 88, 92, 93 and 95 of Lilac Ridge.

The Meadowgreen Parties claim the following on cross-appeal:

1. The trial court erred in failing to award prejudgment interest on their claim of misappropriation of $75,000 and on their claim of breach of contract for the sale of lots 19–39 of Summerhedge Subdivision;

2. The court erred in not imposing a vendor's lien on lots 28–36 of Summerhedge Subdivision; and

3. The court erred in its valuation of the Laytons' shareholder interest in Meadowgreen.

We sustain the trial court's judgment in court-tried equitable actions unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *UT Communications Credit v. Resort Dev.,* 861 S.W.2d 699, 706 (Mo.App.E.D.1993). If there are no findings of fact, all factual issues will be presumed to have been found in accordance with the trial court's holding. Rule 73.01(a)(3). Where there is conflicting evi-

---

1. All statutory references are to RSMo 1994 unless otherwise indicated.

dence, we disregard all evidence and inferences that are not favorable to the judgment. *Page v. Associated Couriers, Inc.*, 868 S.W.2d 138, 141 (Mo.App.E.D.1993). The underlying facts will be set out as relevant to the discussion of the points on appeal. We address the points out of order.

## II.

### DISSOLUTION OF MEADOWGREEN

#### A. *Factual Background*

Joe Layton, John Gorse, and Bill Rice had been partners in the land development and home construction business since the early 1980's. Corporations owned and operated by the partners bought raw, undeveloped tracts of land, subdivided them into single-family residential lots, developed the lots, and sold the improved lots to building companies. The building companies—often owned and operated by the partners as well—would in turn construct homes on the lots and sell the homes to individual purchasers. Meadowgreen was a development company; Glaco, Green Valley and Summerhedge were among the building companies who bought lots from Meadowgreen.

Meadowgreen was incorporated in 1984. 300 shares of stock, each, were issued to John Gorse, Ann Gorse, Joe Layton, and Carol Layton. However, only the Gorses were named as directors, without a durational limit, in Meadowgreen's articles of incorporation.[2] The Gorses were, and are, the only directors named or elected as directors of Meadowgreen. From 1984 through 1986, neither Joe Layton nor John Gorse received any salary from Meadowgreen. In 1987, both received $99,900 as compensation.

In late 1987, Joe Layton expressed his intention to retire from the business, and to use his share of Meadowgreen as a source of retirement funds. Layton testified he wanted to liquidate Meadowgreen and receive his share of the corporation in his personal name before the end of 1988, allegedly the last year he could do so without tax liability. Layton

testified John Gorse was initially amenable to the idea. Gorse denied ever expressing a willingness to liquidate Meadowgreen, and disputed the Laytons' contention they could receive a tax-free transfer of their share of Meadowgreen if the corporation was dissolved before the end of 1988. Gorse also testified he was apprehensive about Layton leaving at that time, due to pending Lilac Ridge and Green Valley Estates subdivision development projects. Gorse's view as to what was to be done with Meadowgreen "was to keep on in business and take advantage of the cash flow it produced."

Relations between the Gorses and Laytons deteriorated as 1988 progressed. As will be detailed below, a major cause of friction was a dispute between John Gorse and Joe Layton concerning a $75,000 Meadowgreen check Layton paid to Summerhedge on February 1, 1988, while the Gorses were away on vacation. Gorse also alleged that, in the fall of 1988, Summerhedge agents, employees, and/or officers entered onto Meadowgreen property without consent and dumped large tree stumps, construction debris, and rocks onto the property, which Meadowgreen had to pay to have removed and which prevented Meadowgreen from selling the property due to the prospective purchaser's dissatisfaction with the property's condition.

According to the Layton/Rice Parties, a meeting of the Meadowgreen shareholders and their attorneys took place on November 23, 1988, wherein Joe and Carol Layton were elected directors of Meadowgreen. This election was followed by a deadlock on how Meadowgreen was to be managed, with the participants voting along marital lines. The minutes for this alleged meeting bear the signatures of the Laytons, but not those of the Gorses. Both Gorse and the attorney representing him in 1988 flatly denied at trial that any such meeting ever occurred. There were no Meadowgreen shareholders' meetings after 1988.

On December 19, 1988, the shareholders of Green Valley and Glaco—the Laytons, Gorses, and Rices—held a meeting to vote on

---

**2.** The Laytons testified at trial they did not want their names on any Meadowgreen documents due to legal problems involving a restaurant they owned, and an ongoing dispute Joe Layton had with St. Louis County.

directors and officers for Green Valley and Glaco. Bill Rice and Joe Layton were voted in as the directors of Green Valley and Glaco (Rice as president, Layton as secretary). John Gorse, who had been president of both companies, was voted out. Also at the meeting, the Laytons presented the Gorses with a proposal for dividing Meadowgreen's assets upon its liquidation, which the Gorses rejected. While the Laytons called the proposal an even fifty/fifty split, Gorse characterized it as a seventy/thirty division in favor of the Laytons. John Gorse no longer received a salary from Green Valley or Glaco after 1988.

Layton received a salary of $240,000 from Meadowgreen in 1988; Gorse received $575,000. Gorse testified Layton did no work and performed no services on behalf of Meadowgreen after 1988.

On January 17, 1989, the Laytons, through their corporation 21 West, filed a petition in equity to liquidate the assets of Meadowgreen (Cause No. 588446). The Laytons also filed a notice of lis pendens with respect to certain real property owned by Meadowgreen, including the Lilac Ridge and Green Valley Estates subdivisions. In this and subsequent amended petitions, the Laytons (later added as individual plaintiffs) claimed the Gorses, as directors of Meadowgreen, were acting illegally, oppressively and fraudulently, and wasting corporate assets. The Laytons specifically alleged, *inter alia*, that John Gorse, Meadowgreen's president, was paying himself an "exorbitant" salary of $50,000 per month, and had excluded the other shareholders (the Laytons) from participation in the management of Meadowgreen. The Laytons further alleged there was a deadlock of directors, and a deadlock of shareholders concerning management of Meadowgreen. The Laytons asked their one-half shareholders' interest in Meadowgreen be awarded to them.

In 1989, Layton received $20,000, one half the proceeds from the sale of lot 39 of Green Valley Estates to Green Valley (which closed in March of 1989). Layton received nothing thereafter. Further, Meadowgreen stopped paying the Laytons' medical insurance, and ceased payments on a car the corporation had provided to the Laytons.

Beginning January of 1989 and continuing up through mid-1990, Meadowgreen paid John Gorse a salary of $50,000 per month. Meadowgreen's former accountant, testifying on behalf of the Layton/Rice Parties, testified this salary was reasonable. Gorse received $600,000 as salary in 1989, and $183,000 in 1990. Meadowgreen also contributed over $180,000 to the Gorses' pension plan during those two years. All told, John and Ann Gorse received approximately $996,332 in 1989 and 1990, but nothing after 1990.

At trial, John Gorse testified Meadowgreen had, at the end of 1988, a value of $500,000. However, he set its contemporaneous value much lower at trial five years later:

Q ... Do you have an opinion as to what the fair market value of Meadowgreen Trails is today considering both its assets, its liabilities, and what it will take to bring those assets to fruition including any salaries that might have to be paid?

A ... I would say it might have [$]25 to $30,000 positive.

For his part, Joe Layton testified Meadowgreen was worth three to three and one-half million dollars at the end of 1988. However, he admitted this amount reflected gross assets, without regard to the corporation's liabilities at that time.

The Layton/Rice Parties entered into evidence a March 20, 1989, financial statement signed by John Gorse and submitted to Lemay Bank in connection with a loan. This statement valued Meadowgreen's assets at $3,159,400, and identified $150,000 in existing liabilities. The assets listed in this statement included the $254,000 balance due Meadowgreen from Summerhedge with respect to a contract for the sale of several Summerhedge Subdivision lots; and thirty Lilac Ridge lots, valued at $1,052,400 or $35,080 per lot, of which all but one were sold to Green Valley for $35,080 per lot ($1,017,320 total). Additionally, a January 31, 1989, bank statement of Meadowgreen was entered into evidence, showing Meadowgreen possessed a cash balance of $295,623.39 at Lemay Bank as of January 1, 1989.

In early 1990, after the failure of Meadowgreen and Green Valley to close on the sale

of fourteen Lilac Ridge lots (detailed below), the Laytons sent letters to every banking and financial institution listed in the St. Louis yellow pages, objecting to loans being made to Meadowgreen or to the Gorses on behalf of Meadowgreen. One letter, dated January 19, 1990, and addressed to Ed Hudspeth of South County Mark Twain Bank, stated:

> This is to inform you that as fifty percent owners of Meadowgreen Trail Inc. we object to any loans made ·to Meadowgreen Trails Inc. by Mark Twain Bank and negotiated by John or [Ann] Gorse because of litigation pending in the courts under the cause number 588446.

Further, a letter to Lemay Bank, dated March 2, 1990, asserted there was a "deadlock" of Meadowgreen directors; and stated, "All checks, account closeouts, loans and other documents signed by John or . . . Ann Gorse as officers of Meadowgreen Trails Inc. are invalid and should be rejected by the bank." Another letter, this time to South Side National Bank and dated March 8, 1990, stated, "[W]e recommend that the Bank investigate the validity of the signatures of either of the Gorses on any document, including but not limited to checks, they may have signed as officers of [Meadowgreen]."

On July 2, 1990, Meadowgreen filed a counterclaim to the Layton's action for liquidation of the corporation (Cause No. 588446), alleging the above letters constituted tortious interference with contracts, business relationships, and business expectancies.

At trial, Carol Layton, who was primarily responsible for the letter-writing campaign, testified she felt it was her "duty" to send the letters because "Meadowgreen was being raped by the Gorses" and she thought she "could save some of the Meadowgreen Trails assets." She was aware Meadowgreen had previously dealt with Lemay Bank and Mark Twain Bank.

According to the Meadowgreen Parties, these letters had a catastrophic impact on Meadowgreen. Prior to 1990, Meadowgreen had been able to obtain $400,000 to $450,000, annually, in financing. However, according to John Gorse, "[s]ince all these letters went out to the financial institutions, savings and loan and banks, we have been unable to procure a loan in Meadowgreen Trails, and almost impossible to get one in our own name." Meadowgreen could not obtain any financing until August of 1993 (three years after the letters were sent), when Lemay Bank lent Meadowgreen $123,201.03 to secure subdivision improvements at Lilac Ridge. The Gorses were required to sign a personal guaranty of this obligation. Also in 1993, John and Ann Gorse personally bought twenty-two lots in Green Valley Estates from Meadowgreen for cash and a promissory note; according to Gorse, this was done to put capital into Meadowgreen and because the corporation could not get any loans from banks or other financial institutions due to the above letters. The Gorses also claimed they were forced to expend approximately $2,000 in negotiating with the financial institutions to whom the letters had been sent.

In its Court Order and Decree, the trial court stated:

> The Court finds and declares Joseph and Carol Layton one-half share holders in Meadowgreen; and award [sic] Joseph and Carol Layton a judgment in the sum of $1,582,511.00.

The court made no findings on the merits of the Laytons' claims of oppression and deadlock. Nor did the court explain how it arrived at its valuation of the Laytons' share. The court also ordered John and Ann Gorse to convey all their stock and interest in Green Valley and Glaco to those corporations, and ordered Joe and Carol Layton to convey all their stock and interest in Meadowgreen to the corporation. The court also stated:

> The Court finds for the Meadowgreen Parties on their claim of intentional interference with business resulting from various letters sent by Joseph Layton and Carol Layton, jointly and severally; finds for the Meadowgreen Parties, on their trespass claim, against [Summerhedge]; and further finds for the Meadowgreen Parties, on their claim for breach of fiduciary duty and for violation of RSMo Sec. 351.400 arising out of the transfer of all Green Valley and Glaco assets to Mican, against Joseph Lay-

ton, William Rice, Green Valley Construction Co., Inc., Glaco, Inc. and Mican Homes, Inc., jointly and severally. With respect to these claims, the Court hereby orders and declares that the recovery due Joseph and Carol Layton offsets the recovery due the Meadowgreen Parties.

Both sides appeal.

### B. *Valuation of Meadowgreen*

■ On appeal, the Meadowgreen Parties claim error with respect to the trial court's valuation of Meadowgreen. We initially note the trial court did not dissolve Meadowgreen, but instead ordered a buy-out of Joe and Carol Layton's shares in Meadowgreen, paid for through the discharge of the three adverse judgments described above. This was within the court's discretion under RSMo § 351.494, which is permissive in nature and provides that trial courts *"may* dissolve a corporation" under certain conditions (i.e., oppression by the directors or controlling element of the corporation, shareholder deadlock). *See Struckhoff v. Echo Ridge Farm, Inc.,* 833 S.W.2d 463, 466 (Mo.App. E.D.1992). Courts are not limited to the remedy of dissolution and may, in equity, consider appropriate alternative forms of relief, including ordering the corporation to pay the petitioning shareholders their proportionate share in money. *Fix v. Fix Material Co., Inc.,* 538 S.W.2d 351, 357 (Mo.App.St.L.D. 1976); *Kirtz v. Grossman,* 463 S.W.2d 541, 545 (Mo.App.St.L.1971). Neither side takes issue with the court's remedy in this case, which separates the Laytons' and Gorses' business interests and allows the couples to go their separate ways.

■ The Meadowgreen Parties vigorously contest the trial court's valuation of Joe and Carol Layton's share of Meadowgreen at $1,582,511. Except for John Gorse's testimony that the corporation was worth $25,000 to $30,000 at the time of trial, all the evidence of Meadowgreen's worth concerned its value as of early 1989, when the Laytons filed their petition to dissolve Meadowgreen. The court apparently based its valuation of Meadowgreen on the evidence offered by the Layton/Rice Parties, in particular the March 20, 1989 financial statement of Meadowgreen.

The Meadowgreen Parties argue (1) the court erred as a matter of law in valuing the Laytons' share of Meadowgreen as of January of 1989, rather than the date of trial and judgment over four years later; and (2) even if the valuation date was correct, the court's award of over one and one-half million dollars to the Laytons as their share of Meadowgreen was "grossly excessive" since it did not consider the liabilities of the corporation, the conduct of the Layton/Rice Parties as it affected the value of the corporation, or the value of the work put into Meadowgreen by the Gorses.

Neither side cites a corporate dissolution case addressing this issue. The Meadowgreen Parties analogize to marital dissolution cases involving the division of marital property. These cases hold marital property must be valued as of the date of trial rather than the date of commencement of the dissolution action. *Taylor v. Taylor,* 736 S.W.2d 388, 391 (Mo. banc 1987). However, marriages are not analogous to corporations—even corporations such as Meadowgreen, where the shareholders are evenly split along marital lines. Despite the Meadowgreen Parties' characterization of the dissolution as a "business divorce," the marital dissolution cases they refer us to involve a separate and distinct area of law and are inapposite. We decline the offer to engraft the rule of those cases onto equitable actions for dissolution of a corporation.

For their part, the Layton/Rice Parties refer us to RSMo § 351.455.1, which provides that shareholders who dissent from a corporate merger are entitled to be paid a "fair value" for their shares, valued as of the day prior to the date on which the vote was taken approving the merger (assuming the shareholders meet the other requirements of the statute). We further take notice of RSMo § 351.405.1, which likewise provides that shareholders who dissent from the sale of all or substantially all of a corporation's assets are entitled to be paid a "fair value" as of the day prior to the date on which the vote authorizing the sale was taken. However, a similar valuation date is conspicuously absent from the corporate dissolution statute applicable here. *See* RSMo § 351.494.

We discern no bright-line rule regarding the date for valuing corporations in dissolution actions. We decline to set out one here on the specific facts before us. The thrust of the Meadowgreen Parties' complaints concerning the trial court's valuation of Meadowgreen is that the valuation did not take into account the precipitous diminution in value of Meadowgreen caused by the Layton/Rice Parties' actions after the filing of the petition for liquidation. The actions of the Layton/Rice Parties specifically referred to by the Meadowgreen Parties as causing Meadowgreen's value to plummet after 1989 include their refusal to pay the outstanding balance on the contract for the sale of the Summerhedge lots; their refusal to close on the fourteen Lilac Ridge lots despite court orders to do so; and their intentional interference with Meadowgreen's business expectancies. However, the court awarded judgment in the Meadowgreen Parties' favor on all these claims, and specifically used the intentional interference with business expectancies judgment to partially offset the Laytons' share of Meadowgreen. Further, the Gorses were compensated for their efforts on behalf of Meadowgreen, by means of the $996,332 in salary and benefits paid out to them in 1989 and 1990; this is another factor in favor of upholding the trial court's judgment.

If the trial court had employed the 1989 value of Meadowgreen but did not rule in the Meadowgreen Parties' favor on any of the other claims, our review would undoubtedly be different. In such a case, the 1989 value of Meadowgreen would be clearly inequitable. In this case, however, the Meadowgreen Parties were compensated for the diminution in Meadowgreen's value, by means of the judgments in their favor on their actions for breach of contract and intentional interference with business expectancies. The court's remedy was within the court's equitable powers, and on the immediate facts, seems a fair resolution of the situation. We accordingly affirm. We limit this holding to the facts of this case.

3. Mican did not join the other members of the Layton/Rice Parties on this point, and argued in favor of the offset at oral argument.

## C. Offset of Claims

The Layton/Rice Parties[3] challenge the offset of the judgment in favor of Joe and Carol Layton on their claim as shareholders against the three judgments in favor of the Meadowgreen Parties on their claims of trespass, breach of fiduciary duty and violation of RSMo § 351.400, and intentional interference with business expectancies.

(1)

■ We first address the Layton/Rice Parties' standing challenges to the above three claims, raised in various other points on appeal. The first of the three judgments in favor of the Meadowgreen Parties and set off against the Laytons' share of Meadowgreen was the intentional interference with business expectancies claim.[4] The Layton/Rice Parties contend the judgment in the Gorses' individual favor was error, since it was Meadowgreen's expectancies, not the Gorses' separate and distinct expectancies, that were interfered with. "A shareholder is without standing to sue in his individual capacity for damages to the corporation." *Around the World Importing v. Mercantile*, 795 S.W.2d 85, 91 (Mo.App.E.D.1990). Rule 84.14 gives this Court the ability to grant the relief the trial court should have granted. The prevailing party on this claim is redefined as Meadowgreen rather than the Meadowgreen Parties.

■ The Layton/Rice Parties also allege the judgment in favor of the Meadowgreen Parties on their trespass claim against Summerhedge should have been in Meadowgreen's favor only. Meadowgreen was the owner of the trespassed property, not the Gorses. As such, only Meadowgreen had the legal right to possession of the property, and only Meadowgreen was injured by Summerhedge's trespass. *See City Bank & Trust Co. of Moberly v. Thomas*, 735 S.W.2d 121, 122 (Mo.App.E.D.1987). We again modify the trial court's judgment pursuant to Rule 84.14 so the judgment on this claim is in Meadowgreen's favor only.

4. The merits of this claim are addressed below.

Finally, with respect to the judgment in favor of the Meadowgreen Parties on their claim of breach of fiduciary duty and violation of RSMo § 351.400,[5] the Layton/Rice Parties contend this claim belonged not to Meadowgreen but to the Gorses individually. This is true. Meadowgreen was not a shareholder in either Green Valley or Glaco and could not have brought such a claim. *See* RSMo § 351.400. The judgment is modified pursuant to Rule 84.14 so it is in favor of John and Ann Gorse only, rather than the Meadowgreen Parties.

### (2)

Having disposed of these standing issues, we now turn to the Layton/Rice Parties' challenge to the trial court's offset of the three above judgments against the Laytons' fifty-percent interest in Meadowgreen. According to the Layton/Rice Parties, the requirements for setting off such judgments were lacking here.

Generally, to warrant a set-off of claims in equitable actions, there must be mutual and subsisting claims between the same parties, due in the same capacity or right. *Sturdivant Bank v. Stoddard County,* 332 Mo. 568, 58 S.W.2d 702, 704 (1933); *Greenwood v. Bank of Illmo,* 782 S.W.2d 783, 786 (Mo.App.S.D.1989). That is, in order for one claim to be set off against another, there must be mutuality of indebtedness. *Greenwood,* 782 S.W.2d at 786. The trial court's set-off of its judgment for Meadowgreen on its claim for intentional interference with business expectancies, against its judgment for the Laytons on their claim for a half-share of Meadowgreen, clearly met this requirement.

With respect to the court's offset of its judgment for the Laytons on their claim for a half-share of Meadowgreen, against its judgment for Meadowgreen on its claim for trespass against Summerhedge, we find the offset permissible on the facts here. Courts may disregard a corporate entity where justice demands it. *See Community Title Co. v. Crow,* 728 S.W.2d 652, 655 (Mo. App.E.D.1987). Here, the Laytons, as the

sole shareholders, directors, and officers of Summerhedge, controlled all aspects of the corporation. Thus, these two offsetting claims involved mutual claims between the same parties.

We last address the trial court's set-off of its judgment for the Gorses on their claim for breach of fiduciary duty and violation of RSMo § 351.400, against its judgment for the Laytons on their claim for a fifty percent share of Meadowgreen. As pointed out by the Layton/Rice Parties, the Gorses' claim does not involve the mutuality of parties required for set-offs, as it was brought against Bill Rice, Green Valley, Glaco, and Mican, as well as Joe Layton. Rice, Green Valley, Glaco, and Mican do not have a corresponding judgment against the Gorses or Meadowgreen which can be offset against the Gorses' claim.

There is, however, an exception to the general rule requiring mutuality of parties in set-offs. Where a set-off serves only to discharge a judgment *against* a non-mutual party, and therefore works that party no prejudice, the set-off is permissible. *Payne v. Payne,* 695 S.W.2d 494, 497 (Mo.App.S.D. 1985). To illustrate: a judgment in favor of A, and against B and C, may be set off against a judgment in favor of B and against A, as the discharge of the judgments works no prejudice to C. *Id.*

Here, the judgment on the Gorses' claim for breach of fiduciary duty against non-mutual parties Rice, Green Valley, Glaco and Mican was set off against the judgment on the Laytons' claim for their share of Meadowgreen, which the Layton/Rice Parties contend should be construed as jointly and severally against John Gorse, Ann Gorse, and Meadowgreen. As such, the offset of these judgments worked no prejudice to the non-mutual parties, as it discharged adverse judgments against them. We find the court's set-off within its equitable powers and permissible on the facts here.

We affirm, as modified, the trial court's set-off of Joe and Carol Layton's share of Meadowgreen against the judgments in favor

---

5. This claim is discussed in more detail below.

of Meadowgreen or John and Ann Gorse on their claims of intentional interference with business expectancies, trespass, and breach of fiduciary duty.

### D. *Intentional Interference with Business Expectancies*

The Layton/Rice Parties contend the trial court erred in rendering judgment for Meadowgreen on its claim for intentional interference with business expectancies. The Layton/Rice Parties argue the requisite elements of this tort were not supported by substantial evidence.

■ To recover on a claim of intentional interference with business expectancies, a plaintiff must prove the following: (1) a valid contract or business expectancy; (2) the defendant's knowledge of the contract or business relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages resulting from the defendant's conduct. *Haas v. Town and Country Mortg. Co.*, 886 S.W.2d 225, 228 (Mo.App.E.D.1994). The plaintiff must adduce substantial evidence supporting each and every element. *SSM Health Care, Inc. v. Deen*, 890 S.W.2d 343, 346 (Mo.App. E.D.1994).

■ As in most tortious interference cases, the element disputed here is the fourth—absence of justification. The Layton/Rice Parties argue there was no substantial evidence their communications with St. Louis area banks and lenders were not justified. Absence of justification is the absence of any legal right to take the actions about which the other party complains. *Id.* "One who has an existing economic interest in another's business affairs is privileged to interfere with a business expectancy to protect his own interest and is not liable for such interference if his action was one which he had a definite legal right to take without any qualification." *Cent. Bank of Lake of Ozarks v. Shackleford*, 896 S.W.2d 948, 956 (Mo.App. S.D.1995). Protecting one's economic interest constitutes justification, unless one utilizes improper means to protect that interest. *Community Title v. Roosevelt Federal S & L*, 796 S.W.2d 369, 373 (Mo. banc 1990).

"Improper means" refers to means which are independently wrongful notwithstanding the injury caused by the interference, including misrepresentation of fact, threats, violence, defamation, trespass, restraint of trade, or any other acts wrongful under statute or common law. *Id.*

■ The Layton/Rice Parties contend the letters sent to every financial institution in the St. Louis area conveyed only accurate information. We disagree. In these letters the Laytons, *inter alia*, asserted there was a deadlock of directors; claimed all documents signed by the Gorses relating to Meadowgreen were invalid; and urged investigation of the validity of the Gorses' signatures on Meadowgreen documents, including checks. However, as directors, the Gorses were authorized to sign Meadowgreen documents, including checks; the Laytons' suggestions to the contrary were apparent falsehoods. Further, the only directors listed in Meadowgreen's articles of incorporation were John and Ann Gorse. There was conflicting evidence as to whether the November 23, 1988, meeting—where the Layton/Rice Parties claimed there was a deadlock of Meadowgreen's directors—ever occurred. The court could have found that this meeting did not, in fact, take place, and that the Laytons' claim of director deadlock in their letters also constituted a misrepresentation of fact.

■ While the Laytons did have an economic interest in Meadowgreen, the evidence supports a finding they used improper means in protecting that interest. False statements tending to prejudice or injure a person in the person's business, by suggesting the person is unreliable, insolvent, or the like, are independently actionable. *Tri–County Retreading, Inc. v. Bandag Inc.*, 851 S.W.2d 780, 786 (Mo.App.E.D.1993). The trial court did not err in finding an absence of justification in this case.

As for the other elements—valid business expectancy on the plaintiff's part, knowledge of this expectancy on the defendant's part, intentional interference by the defendant causing a breach in the relationship, and damages from the defendant's conduct—there was substantial evidence to support a

claim of intentional interference with business expectancies. Meadowgreen had obtained prior loans from Lemay Bank and Mark Twain Bank, two of the banks who received letters from the Laytons, and the Gorses expected to obtain loans from them in the future. Carol Layton testified she was aware Meadowgreen had previously dealt with these two banks when she sent the letters to them. John Gorse testified that, due to these letters, Meadowgreen was unable to obtain financing from anyone until August of 1993, when Lemay Bank lent the corporation $123,201.03—which the Gorses had to personally guarantee. The evidence supported a finding that the Laytons' correspondence effectively destroyed Meadowgreen's ability to obtain financing vital to the corporation's fiscal well-being.

The trial court's judgment on the intentional interference claim was sufficiently supported by the evidence. This point on appeal is denied.

### E. *Misappropriation of $75,000*

On February 1, 1988, while the Gorses were on vacation in Florida, Joe Layton took a blank Meadowgreen check endorsed by John Gorse and paid $75,000 to Summerhedge, for "development costs." Gorse had left the signed check behind to cover any Meadowgreen emergency expenses that arose in his absence. As the only listed directors and officers of Meadowgreen, John and Ann Gorse were the only persons authorized to sign checks on behalf of Meadowgreen. No bill or invoice was ever submitted by Summerhedge to Meadowgreen for this amount. According to Gorse, he never agreed to the payment and was in fact unaware of it until later that year, when going over the corporation's accounts. He characterized the $75,000 check as an unauthorized payment to Summerhedge and confronted Layton with it. This dispute was a major factor in the demise of the Gorse–Layton land development partnership.

On September 21, 1989, Meadowgreen filed Cause No. 600484. In Count III, Meadowgreen prayed for recovery of the $75,000, plus interest, under the theory of money had and received. The first amended petition filed January 9, 1991, prayed for the same relief, plus interest as of February 1, 1988. The trial court entered judgment in favor of the Meadowgreen Parties in the amount of $75,000, but awarded no interest.

#### (1)

■ The Layton/Rice Parties' only challenge on appeal to the propriety of the trial court's judgment on this claim again concerns the standing of John and Ann Gorse to receive the judgment in their favor as individual shareholders of Meadowgreen. According to the Layton/Rice Parties, it was Meadowgreen's corporate funds, not the Gorses' own money, that was wrongfully diverted to Summerhedge. Corporate shareholders cannot maintain personal actions for recovery of improperly diverted or appropriated funds or property of the corporation. *Dawson v. Dawson,* 645 S.W.2d 120, 125 (Mo.App.W.D.1982). Any injury is to the corporation, not to individual shareholders; suit must be brought derivatively. *Id.* The court judgment is herein modified pursuant to Rule 84.14 so the judgment is in favor of Meadowgreen only.

#### (2)

The Meadowgreen Parties claim error on appeal with respect to the trial court's failure to award statutory prejudgment interest. The Meadowgreen Parties assert they were entitled to interest from February 1, 1988, the date the $75,000 Meadowgreen check was paid to Summerhedge.

■ Generally, prejudgment interest must be awarded on liquidated claims. Meadowgreen's action for recovery of the $75,000 it paid to Summerhedge was for money had and received, or the recovery of money wrongfully paid to the defendant that, in equity and good conscience, should be paid over to the plaintiff. *Perez v. Boatmen's Nat. Bank,* 788 S.W.2d 296, 299 (Mo.App. E.D.1990). As such, it was clearly a liquidated claim: that is, it was for a fixed and determined amount, or an amount readily ascertainable by computation or a recognized standard. *Schnucks Carrollton Corp. v. Bridgeton Health and Fitness,* 884 S.W.2d

733, 740 (Mo.App.E.D.1994). RSMo § 408.020 requires that prejudgment interest be awarded at a rate of nine percent per annum whenever the amount due is liquidated or, if not strictly liquidated, readily ascertainable by reference to recognized standards. *Dierker Associates, D.C., P.C. v. Gillis*, 859 S.W.2d 737, 746 (Mo.App.E.D. 1993). In actions for money had and received, "interest should be allowed from the time of demand," and if no demand is made prior to the bringing of the action, the date the action was instituted is considered the time of demand. *Brink v. Kansas City*, 358 Mo. 845, 217 S.W.2d 507, 511 (1949). In this case, the date of Meadowgreen's demand was when it filed Cause No. 600484 on September 21, 1989.[6]

However, this suit was in equity. In equitable actions, the determination of whether to award prejudgment interest is left to the discretion of the trial court. *Vogel v. Lake Timberline Property Owners*, 741 S.W.2d 869, 872 (Mo.App.E.D.1987). *See also Boyle v. Crimm*, 363 Mo. 731, 253 S.W.2d 149, 157 (1952); *Ins. Co. of N. Am. v. Skyway Aviation*, 828 S.W.2d 888, 892 (Mo. App.W.D.1992).[7] The trial court's failure to award prejudgment interest on Meadowgreen's action for money had and received is reversible only for an abuse of discretion, which we do not find. The Meadowgreen Parties' point is denied.

## III.

## THE LILAC RIDGE TRANSACTION

### A. *Factual Background*

The bulk of the claims at trial and on appeal stem from a failed real estate transaction between Meadowgreen and Green Valley, entered into after the break-up of John Gorse's and Joe Layton's land development partnership late in 1988. By contract dated May 26, 1989 ("the May 26 contract"), Meadowgreen as seller agreed to convey to Green Valley as purchaser lots 52, 58, 60, 62–65, 68–73, 75–80, 82–84, 87–89, and 92–95 of Lilac Ridge subdivision—twenty-nine lots— for $1,017,320, or $35,080 per lot. Pursuant to a "Special Agreement" that was part of the May 26 contract, the lots were to be conveyed in two scheduled closings: fifteen lots on June 30, 1989, and fourteen lots on September 29, 1989. The closings were to take place at the offices of Missouri Title Company ("Missouri Title"), the title insurer for the Lilac Ridge lots. Time was of the essence. The Special Agreement also stated:

> Purchaser reserves the option to close on a lot to lot basis before the final closing of the remaining 14 lots.

The contract contained no references to escrow. Bill Rice signed the May 26 contract on behalf of Green Valley; John Gorse signed on behalf of Meadowgreen.

Well before the May 26 contract was entered into, on January 10, 1989, Bill Rice and Joe Layton incorporated Mican. From February 1, 1989 to April 30, 1989, Green Valley and Glaco (under Rice's and Layton's direction) transferred virtually all their assets to Mican. The assets transferred to Mican consisted of: lots 1, 2, 12, 14, 38–40, 43, 45, 46, 48, 51, 53–57, 59, 60, 61, 68, 69, 86 and 91 of Lilac Ridge Subdivision; a three-fourths interest in a condominium; and several trucks and items of construction equipment. In return, Green Valley and Glaco received demand notes, plus direct cash payments. No demand had been made on the notes as of the date of trial. The transfers of the above assets to Mican were never submitted to a vote at a meeting of shareholders of Green

---

**6.** It is not clear from the record if, or when, any demand for the $75,000 was made prior to the filing of Cause No. 600484. The only indication a demand for the $75,000 may have been made prior to filing was John Gorse's testimony during direct examination:

> Q Did you see that accrual at any time prior to this trial?
> A I—Somewhere along the line I seen [$]75,-000 and I made an issue of it, sir.

**7.** Cases mandating, as opposed to merely permitting, awards of prejudgment interest where RSMo § 408.020 is applicable involve actions at law, rather than equity. Thus, in those cases, "[e]quitable principles of fairness and justice may not be considered when awarding prejudgment interest on a liquidated demand." *Huffstutter v. Michigan Mut. Ins. Co.*, 778 S.W.2d 391, 395 (Mo.App.E.D.1989). *See also Holtmeier v. Dayani*, 862 S.W.2d 391, 407 (Mo.App.E.D. 1993).

Valley or Glaco nor approved by a two-thirds vote of the shareholders. John Gorse was never provided any notice of the proposed transfers or notice of a meeting where the transfers would be submitted to a vote. *See* RSMo § 351.400.

By general warranty deed, recorded May 26, 1989, Green Valley transferred all its right, title and interest in lots 52, 58, 60, 62–65, 68–73, 75–80, 82–84, 87–89, and 92–95 of Lilac Ridge Subdivision to Mican. The deed was signed by Joe Layton on behalf of Green Valley.

On June 30, 1989, pursuant to the May 26 contract, Meadowgreen conveyed lots 52, 58, 60, 62–65, 68–70, 87–89, 94, and 95 of Lilac Ridge Subdivision to Green Valley. Meadowgreen received payment of the $526,200 purchase price. By the time of trial, Mican (to whom Green Valley had transferred title to the lots) had sold lots 52, 58, 60, 62, 64, 68–70, 87, 89, and 94 to third parties; it still held lots 63, 65, 88, and 95.

On August 11, 1989, Meadowgreen filed a motion to set aside the notice of lis pendens the Laytons had filed on January 10, 1989, with their petition to liquidate Meadowgreen. Meadowgreen asserted the action for liquidation of Meadowgreen was not an action "affecting or designed to affect real estate" and did not allege an interest in Meadowgreen's real property entitling the plaintiffs (the Laytons) to right of possession or title to the property. *See* RSMo § 527.260.

The closing on lots 71–73, 75–80, 82–84, 92, and 93 was set for September 29, 1989. At this closing, the purchase price of $491,120 was to be paid by Green Valley through the payoff of $368,340 of a note to Lemay Bank secured by a deed of trust on the Lilac Ridge lots; payment of $50,000 cash to Meadowgreen; and a second deed of trust to Meadowgreen on lots 71, 72, 73, 80, 84, and 92 for the $72,780 balance.

At the September 29, 1989, closing, Joe Layton requested that the purchase money be held in escrow. Layton later testified he

requested the escrow "[o]n behalf of Meadowgreen as a stockholder in Meadowgreen." John Gorse informed Missouri Title he would not agree to an escrow. For his part, Bill Rice testified he, and not Layton, represented Green Valley at the closing; he was always ready and willing to close on the remaining fourteen lots on September 29; and, in fact, he was there with the $50,000 earnest money check, and had arranged for a loan to pay off Meadowgreen's deed of trust. The closing did not occur.

On November 2, 1989, Meadowgreen's motion to set aside the Laytons' notice of lis pendens was granted, the notice of lis pendens was set aside, and the Laytons were ordered "to cooperate in all acts necessary" to remove the notice from the Meadowgreen's title. The Laytons filed a second *ex parte* notice of lis pendens that same day, after the first order setting aside the notice of lis pendens was issued. The second notice was orally set aside by a different judge. On November 15, after this Court had denied the Laytons' writ of prohibition, the trial court issued a second written order setting aside the notice of lis pendens, again ordering the Laytons "to cooperate in all acts necessary" to remove the notice from the Meadowgreen's title.[8]

Despite the above orders, the Laytons' attorney indicated in a letter to Missouri Title dated November 16, that, in his opinion, the notice of lis pendens had not been affected and was still a cloud on title. The letter threatened legal action if Missouri Title released any monies it held in escrow to Meadowgreen and/or the Gorses.

A letter to John Gorse dated November 28, 1989, and signed by Doris Osborne, then manager of Missouri Title's South County office, stated what Ms. Osborne later testified was the title company's position as to why the September 29, 1989 closing did not occur:

> The cross purposes and contention between yourself and Green Valley Construc-

---

8. Several months later, Meadowgreen would file a motion for contempt against 21 West, Joe Layton, and Carol Layton, alleging the Laytons continued to assert to title companies that the notices of lis pendens remained in force. On

March 1, 1990, the court issued yet another order, which stated, "[A]ny and all notice(s) of lis pendens heretofore filed, and/or recorded, ... are null and void and of no force and effect...."

tion Company, Inc., remains unresolved. All parties have signed closing documents, however, the parties gave Missouri Title Company conflicting requirements for the disbursement of funds, which resulted in our not being in a position to consummate the closing.

Ms. Osborne sent the letter at the direction of John O'Brien, then executive vice-president of Missouri Title. O'Brien later testified at trial that Missouri Title unilaterally required the sales proceeds be put into escrow, due to the pendency of a lawsuit between the parties, which "would have been a cloud on the title." He insisted Joe Layton's demand for an escrow had nothing to do with Missouri Title's decision.

After the failure to close on September 29, 1989, Meadowgreen and Green Valley mutually agreed to reschedule the closing for December 15, 1989. The two corporations entered into a contract dated December 13, 1989 ("the December 13 contract"). This contract was virtually identical to the May 26 contract; in fact, it stated, "CONTRACT ACCEPTED 12:00 p.m. of May 26, 1989[.]" The lot-by-lot provision set out in the May 26 contract was replicated in the December 13 contract. The December 13 contract, like its predecessor, lacked any reference to escrow. The contract was again signed by Bill Rice on behalf of Green Valley and by John Gorse on behalf of Meadowgreen. The only pertinent difference was the addition of the following clause:

> All improvements to be completed as per St. Louis County approved plans and specifications and all utilities completed before the final closing of remaining 14 lots.

At the December 15, 1989, closing, Joe Layton again demanded that the purchase money be held in escrow. John Gorse again refused. Bill Rice testified that, as with the September closing, he, and not Layton, represented Green Valley at the closing; he was always ready and willing to close on the remaining fourteen lots; and checks for $50,-000 and for the payoff of the note secured by the deed of trust were at the title company,

to be released to Meadowgreen upon receipt of the deed to the lots.

However, unlike the September 29, 1989, closing, Joe Layton did not demand an escrow of the proceeds from lots 71 and 92. Interestingly, Mican had started construction of homes on these lots (despite its lack of legal title). In fact, a home had been completed on lot 71 by December 15, 1989. Bill Rice testified this construction was done with John Gorse's knowledge and consent, and was in fact their usual practice. Rice also claimed he had discussed closing on lot 71 with Gorse during the period between September 29 and December 15, 1989, and offered into evidence notes he claimed he made contemporaneously with those discussions. For his part, Gorse denied he had ever authorized construction on the two lots, or that there was any custom or practice of allowing building companies to build on any lots prior to closing on the lots.[9] Gorse also denied discussing closing on lots 71 and 92 with Rice prior to December 15, 1989. Gorse refused to close on lots 71 and 92. No closing occurred, on fourteen lots or on two.

Mican had entered into a residential sales contract, dated July 25, 1989, for the sale of lot 71 to Paul and Constance Anderson, with closing to occur on December 15, 1989. Bill Rice testified he was ready and willing to close on these two lots, and that the failure to close on lot 71 meant Mican was unable to convey title to the Andersons pursuant to their contract.

When asked at trial why he requested an escrow, Layton testified "when Meadowgreen received any money it would immediately or soon after go into the Gorses' hands." He claimed he made his request for escrow "as a stockholder in Meadowgreen" because he thought it was in Meadowgreen's "best interests."

On December 19, 1989, Meadowgreen and John Gorse filed Cause No. 604703 against Joe Layton, Bill Rice, Green Valley, Glaco, and Mican. The action originally consisted of two counts. Count I was an action for

---

**9.** Gorse acknowledged one exception to this—lot 39 of Green Valley Estates, which closed after a

"spec home" had already been built on the lot.

accounting by John Gorse as a shareholder of Green Valley and Glaco. With respect to this count, Gorse alleged, *inter alia,* Joe Layton and Bill Rice breached their fiduciary duties as directors of Green Valley and Glaco by: causing Green Valley to breach its contractual obligation to Meadowgreen with respect to the Lilac Ridge lots, dissipating Green Valley's and Glaco's assets, depriving Green Valley and Glaco of substantial income by transferring developed real estate to Mican for inadequate consideration, and prohibiting Gorse from active participation in the affairs of Green Valley. Count II was an action by Meadowgreen against Green Valley for specific performance of the May 26 contract.

On December 28, 1989, the defendants in Cause No. 604703 filed their answer and counterclaim. The counterclaim consisted of an action by Green Valley against Meadowgreen for breach of the May 26 and December 13 contracts; an action for specific performance of the December 13 contract with respect to lots 71 and 92; and an action for damages for tortious interference with Mican's July 25, 1989, contract for the sale of lot 71 to the Andersons.

On July 2, 1990, Meadowgreen added two more counts: Count III, an action for injunctive relief, prohibiting Green Valley and Glaco from selling further assets to Mican; and Count IV, an action by John Gorse individually under RSMo § 351.400 for the value of his shares in Green Valley and Glaco prior to the transfer of their assets to Mican.

On October 4, 1990, Meadowgreen moved for partial summary judgment on its action for specific performance of the May 26 contract (count II of Cause No. 604703). On December 21, 1990, the court issued the following order:

> Motion is sustained. Parties ordered to close real estate transaction within 30 days. Funds received to be placed in escrow with the clerk in interest bearing account, however payment from such account may be made to pay deed of trust, accrued taxes & insurance upon further order after proof of the same is shown to the Court.

On February 20, 1991, Meadowgreen filed a motion for contempt, alleging Green Valley refused to close despite the above order. In its motion, Meadowgreen asked the court to order Green Valley to close within ten days, and impose a per diem fine for each day thereafter that Green Valley refused to close.

On March 6, 1991, Meadowgreen's motion was heard. Green Valley presented three reasons for not closing. Green Valley alleged mechanic's liens had been filed on lots 71 and 92; however, as later came to light, these liens had been caused by the failure of Mican (who was constructing homes on the lots at the time) to pay its subcontractors. Green Valley also claimed Meadowgreen would be unable to obtain a release of the deed of trust held on the lots by Lemay Bank. Finally, Green Valley argued that due to a drainage problem, St. Louis County refused to issue building permits for the lots, and Meadowgreen therefore breached the contractual provision requiring improvements to be completed per St. Louis County specifications. The court rejected all three arguments, took Meadowgreen's motion for contempt under submission, and ordered the closing to take place on March 13, 1991.

The drainage problem referred to by Green Valley first became an issue after Meadowgreen's motion for partial summary judgment. Apparently, a stormwater line running under Highway I–55 caused excessive water runoff onto several Lilac Ridge lots. Bill Rice testified at trial that he talked with John Gorse regarding this problem on October 23, 1989, and offered notes he allegedly took during the conversation; however, Gorse denied ever talking to Rice about any water runoff problems. Prior to December 15, 1989, no building permits had ever been denied for any Lilac Ridge lots.

Two letters concerning the drainage problem were entered into evidence at trial. In an October 12, 1990, letter to the Director of the St. Louis County Department of Public Works, the St. Louis County Department of Highways expressed concern over problems with water runoff at Lilac Ridge. This letter was apparently in response to a complaint from a Lilac Ridge homeowner. The letter requested the Department of Public Works

to withhold any further building permits for Lilac Ridge until "the developer ... received the approval of this Department for a revised drainage system to handle the additional run off." In a March 11, 1991, letter addressed to Bill Rice, Donald Spencer, Engineer of Planning and Design for St. Louis County, informed Rice that the Department of Public Works was withholding building permits for the Lilac Ridge lots "until the existing drainage condition overlooked by the developer and his engineer is corrected."

On March 12, 1991, Green Valley advised Meadowgreen it would refuse to close. On March 15, 1991, a second hearing was held. At this hearing, the court was advised that on March 22, 1991, Lemay Bank would foreclose on the deed of trust it held on the Lilac Ridge lots. Green Valley raised the three exceptions it had previously argued on March 6, and additionally alleged title was clouded due to delinquent taxes. The court overruled Green Valley's exceptions and ordered the parties to close the transaction during the week of March 18, but before March 22, 1991.

The final closing was scheduled for March 21, 1991. On March 19, Green Valley's attorney informed John Gorse that Green Valley would refuse to close and would not tender payment, and provided copies of the above letters regarding the drainage problem. Neither Bill Rice nor Joe Layton showed up at the closing; however, Carol Layton was there, with an envelope. Mrs. Layton testified at trial that she was sent there by her husband and Rice, "to call them if there was any chance of a closing." She also testified she did not know the contents of the envelope; in particular, she did not know whether the funds needed to pay for the Lilac Ridge Subdivision lots were in there. No one acting on Green Valley's behalf tendered any portion of the purchase price, and the closing did not occur.

Lemay Bank foreclosed on the deed of trust on March 22, 1991. This deed of trust extended to eight lots in Green Valley Estates, in addition to the fourteen Lilac Ridge lots. Lemay Bank purchased the fourteen Lilac Ridge lots for $280,000, which was credited to Meadowgreen's indebtedness to Lemay Bank. John Gorse personally purchased the eight Green Valley Estates lots for $168,000 in cash.

On March 28, 1991, the Meadowgreen Parties filed another motion for contempt and sanctions, alleging the Layton/Rice Parties "deliberately and contemptuously" disregarded the court orders setting aside the notices of lis pendens with respect to the Lilac Ridge lots; ignored court orders directing compliance with discovery requests; and refused to obey the three separate court orders directing Green Valley to close on the Lilac Ridge lots. The Meadowgreen Parties further alleged the remedy ordered by the court, specific performance, was rendered useless by the Layton/Rice Parties' contemptuous conduct. The Meadowgreen Parties asked that judgment be entered in their favor on their claim of breach of contract. They also requested that Green Valley, Joe Layton, Carol Layton, and Bill Rice be held in contempt and that an award of expenses, including attorney fees, be awarded to the Meadowgreen Parties to "balance the equities." The Meadowgreen Parties' motion for contempt was heard on February 28, and March 3, 1992.

Several months after the foreclosure on the deed of trust, Lemay Bank and Mican entered into an agreement wherein Mican would buy the fourteen Lilac Ridge lots from Lemay Bank on a lot-by-lot basis, subject to the moratorium on building permits. Both Bill Rice and Joe Layton testified at trial that Lemay Bank approached them and offered to sell the lots; however, in deposition testimony entered into evidence, Rice stated, "We approached the bank first."

Mican began purchasing the Lilac Ridge lots late in 1991. At the time of trial Mican had purchased twelve of the fourteen lots. Mican purchased lots 71 and 92, the lots Joe Layton and Bill Rice wanted to close on at the December 15, 1989, closing, for $35,000 each. Mican purchased the other ten lots for $19,000 per lot, with an additional escrow of $10,000 on each. The escrowed funds were to be used for the completion of subdivision improvements and correction of the Lilac Ridge drainage problem, with any surplus

returned to Mican.[10] Pursuant to an accommodation reached by Mican and St. Louis County, building permits would be issued on a lot-by-lot basis so long as correction of the drainage problem was actively pursued. By the time of trial, lots 71 and 79 had been sold to other parties. John Gorse testified he did not become aware of the arrangement between Mican and Lemay Bank until mid–1992.

On September 23, 1992, Meadowgreen filed Cause No. 642708 against Green Valley and Mican. In the first count of this action, Meadowgreen sought the imposition of a vendor's lien on Lilac Ridge lots 63, 65, 72, 73, 75–78, 80, 82–84, 88, 92, 93, and 95 (sixteen lots total), for an amount equal to the damages for breach of the May 26 and December 13 contracts. In the second count, Meadowgreen sought damages for unjust enrichment. Also on that date, Meadowgreen filed a notice of lis pendens with respect to the Lilac Ridge lots.

On April 30, 1993, the trial court issued findings of fact, conclusions of law, and an interlocutory judgment with respect to the contempt and breach of contract issues. The court found Green Valley did not act in good faith in refusing to proceed with the closing, and the foreclosure was the "directly predictable consequence" of Green Valley's refusal to proceed. The court found Meadowgreen was entitled to damages in lieu of specific performance, as performance was no longer possible due to the foreclosure. The court further found Green Valley guilty of civil contempt, and added that Joe Layton, Carol Layton and Bill Rice "participated in the contemptuous acts here enumerated and should be subject to monetary sanctions therefor." While the court made its finding of contempt independent of the evidence of Mican's purchase of the Lilac Ridge lots after foreclosure, it stated this evidence demonstrated a contumacious attitude.

All the above claims went to trial. The trial court, in its March 4, 1994, Court Order and Decree, ruled in favor of the Meadowgreen Parties and against Green Valley, Joe Layton, Carol Layton, Bill Rice, and Mican on Meadowgreen's breach of contract claim, its unjust enrichment claim, its contempt claim, and also John Gorse's claim for breach of fiduciary duty and violation of RSMo § 351.400. The court also granted vendor's liens on the sixteen Lilac Ridge lots in Mican's possession. The Layton/Rice Parties appealed.

### B. Breach of Contract

The Layton/Rice Parties raise several claims of error with respect to the trial court's finding for the Meadowgreen Parties on their claims of breach of the May 26 and December 13 contracts.

#### (1)

The Layton/Rice Parties first allege Green Valley did not breach the contracts because it fully performed its obligations on the closing dates. They claim the following. Bill Rice, not Joe Layton, was acting on behalf of Green Valley on the closing dates; Rice was ready and willing to close on Green Valley's behalf on those dates; the closings failed to occur not because of any act or omission of Rice or Green Valley but because Missouri Title unilaterally imposed an escrow requirement; and, even if Missouri Title's retention of the proceeds stemmed from Layton's request for escrow, this request was made in Layton's capacity as a Meadowgreen shareholder and thus was a matter outside Green Valley's control.

 Our focus here is on the rescheduled closing set for December 15, 1989. As vendor, Meadowgreen's duty on that date was to convey marketable title to Green Valley. *Nixon v. Franklin*, 289 S.W.2d 82, 87 (Mo.1956). The record shows John Gorse was ready and willing to convey marketable title to the Lilac Ridge lots on Meadowgreen's behalf on December 15, 1989. There is no claim or indication that Meadowgreen's title to the lots was defective in any way. The Laytons' two notices of lis pendens had been properly set aside, as the Laytons' ac-

---

10. Approximately $40,000 to $50,000 had been expended by the time of trial to correct the drainage problem.

tion for dissolution of Meadowgreen was not "based on any equitable right, claim or lien, affecting or designed to affect real estate." RSMo § 527.260. Nor did the deed of trust, imposed as security for Lemay Bank's loan, render title unmarketable: the December 13 contract expressly provided the purchase money due at closing was to satisfy and discharge this deed of trust. In sum, Meadowgreen fully complied with, and performed its obligations under, the December 13 contract, and was entitled to specific performance, or damages in lieu thereof.

▌ The Layton/Rice Parties argue Green Valley performed its obligations under the December 13 contract as well. They contend Bill Rice was ready and willing to pay the purchase money on December 15, 1989, and Joe Layton's demand for an escrow was a matter outside Green Valley's control. We disagree.

First, we think it clear that Bill Rice was not, as he claimed, an impartial outsider caught in the middle of a dispute between John Gorse and Joe Layton. He and Layton had taken control of Green Valley and Glaco together, incorporated Mican together, and transferred all the assets of Green Valley and Glaco to Mican together. Rice and Layton had been acting in concert at all times up to, during, and after the December 15, 1989, closing. The record supports a finding that Rice and Layton were acting together at the time of the closing.

The record further supports a finding that Joe Layton's request for an escrow was made in his capacity as a director of Green Valley and not, as the Layton/Rice Parties insist, in his capacity as a shareholder of Meadowgreen. Layton and Rice controlled Green Valley at the time Green Valley and Meadowgreen entered into the Lilac Ridge transaction, and Layton was authorized to act on Green Valley's behalf. In fact, Layton signed, on Green Valley's behalf, the contract between Green Valley and Mican selling the Lilac Ridge lots to Mican, as well as the warranty deed conveying Green Valley's right, title and interest in the Lilac Ridge

lots to Mican. Additionally, Missouri Title clearly regarded Layton's demand for escrow as being made on behalf of Green Valley, as evidenced by its November 28, 1989, letter to John Gorse.

On the other hand, the only evidence Layton was acting in his capacity as a Meadowgreen shareholder in demanding the escrow was his and Rice's testimony, which the court was free to disbelieve. Layton's testimony in particular strains credulity. Layton claimed his demand for an escrow of the full purchase price was made with Meadowgreen's best interests in mind. The December 13 contract expressly provided that three quarters of the proceeds from the sale of the fourteen Lilac Ridge lots were to go directly to Lemay Bank, to pay off the note secured by the deed of trust on those lots; yet despite Meadowgreen's obligation to Lemay Bank, Layton continued to demand that the full purchase price (not just the net proceeds) be held in escrow.[11] Not allowing Meadowgreen to discharge its debts could not reasonably be in the corporation's best interests. Further, Layton relented on his escrow demand with respect to lots 71 and 92. Layton was clearly not acting on behalf of Meadowgreen in doing so. Layton's change of heart with respect to those two lots obviously came about because Mican had already started construction on the lots and in fact had sold one of them to third parties.

Layton also testified he demanded an escrow of the full purchase price because any money Meadowgreen received would "immediately or soon after go into the Gorses' hands." However, Layton's alleged concern that the Gorses would divert the proceeds from the Lilac Ridge lots to themselves did not provide an excuse for preventing the December 13 contract from closing. Layton was not entitled to an escrow as a means to pursue claims unrelated to the contract at issue.

The Layton/Rice Parties also suggest Missouri Title, not Joe Layton, was the source of the demand for escrow which doomed the

---

11. By contrast, Layton claimed that a 1991 agreement between Mican and Meadowgreen, requiring that the "gross proceeds" from the

sales of Summerhedge lots by Mican be put into escrow, referred only to the proceeds left after the obligations on those lots had been paid off.

December 15, 1989, closing. They cite in particular John O'Brien's testimony that Missouri Title's decision to require an escrow of the purchase money was unilaterally made by the title company, independent of Layton's request.

We think it clear that Layton's insistence on the purchase money being held in escrow was what prompted Missouri Title to require that the money be retained in escrow before it would allow the closing to be consummated. Missouri Title's November 28, 1989, letter to John Gorse explained why the company required an escrow of the sales proceeds at the September 29, 1989, closing: "the parties gave Missouri Title Company conflicting requirements for the disbursement of funds, which resulted in our not being in a position to consummate the closing."

Additionally, John O'Brien's explanation for why Missouri Title "unilaterally" required an escrow was riddled with inconsistencies. According to O'Brien, the Laytons' notice of lis pendens created a cloud on the title, which was why Missouri Title required the sales proceeds be put into escrow; yet he admitted this notice had twice been set aside by the December 15, 1989, closing, and further, the title company did not require an escrow at the June 30, 1989, closing, when the notice of lis pendens was still in force. O'Brien could not explain why Missouri Title did not require an escrow at the June 30, 1989, closing on the first fifteen lots, when the notice of lis pendens was still in force, yet required an escrow on December 15, 1989, when the same notice had twice been set aside. The record supports a finding that the closing failed because of Layton's, not Missouri Title's, request for escrow.

The Layton/Rice Parties also contend Meadowgreen failed to meet its obligation, under the December 13 contract, to complete the Lilac Ridge lots' improvements pursuant to St. Louis County specifications. The Layton/Rice Parties claim this provision was a "condition precedent" to Green Valley's duty to close. This contention is without merit. The improvements provision was not an issue at the December 15, 1989, closing. The lots' failure to comply with St. Louis County specifications due to flawed drainage was never assigned as a reason for not closing on that date. No building permits had been denied for any of the lots, for any reason, prior to December 15, 1989. The earliest evidence of the lots' failure to meet St. Louis Count specifications is the letter regarding the complaint about the drainage problem, dated October 11, 1990—nearly ten months after the closing should have occurred. Finally, despite this drainage problem, Layton and Rice (through Mican) purchased nearly all these lots after foreclosure, thereby belying their claim that the lots' failure to comply with St. Louis County specifications was such that the contract could not be performed.

■ The specifications provision inserted into the December 13 contract was not at all relevant to Green Valley's failure to close on December 15, 1989. Meadowgreen had fully performed its contractual obligations on that date. Where a contractual party has fully performed its obligations under the contract, that party has a vested right to performance by the other party in accordance with the contract's terms. *Union Pacific Railroad Co. v. Kansas City Transit Co.*, 401 S.W.2d 528, 536 (Mo.App.K.C.1966). The Layton/Rice Parties' argument at the contempt hearings on March 6 and 15, 1991, and at trial, that the improvements on the Lilac Ridge lots failed to meet St. Louis County specifications, was a *post hoc* rationalization for Green Valley's refusal to close on December 15, 1989. Green Valley had no reason not to close as ordered by the court. If the Lilac Ridge lots did in fact fail to comply with St. Louis County specifications, Green Valley's proper recourse would have been to sue for damages.[12] The December 15, 1989, closing failed to occur because Green Valley insisted that the proceeds be paid into an unspecified escrow account. This demand for an escrow of the full purchase price did not comport with the contract as agreed to by the parties. No escrow was required by the contract; on the contrary, the contract expressly provided that the sales proceeds were to be available for the discharge of

---

12. At trial, the attorney for the Meadowgreen Parties intimated that Meadowgreen would be willing to pay to correct any defects in the drainage.

Meadowgreen's obligation to Lemay Bank. Green Valley's demand that the proceeds be held in escrow required Meadowgreen to agree to a material term not contained in the contract and not otherwise required at law. The trial court did not err in finding for Meadowgreen and awarding damages in lieu of specific performance.

### (2)

The Layton/Rice Parties contend any judgment in connection with the May 26 contract must be reversed, as the December 13 contract modified and replaced the May 26 contract and, therefore, all claims and actions must lie on the new contract. Although they never use the term, the Layton/Rice Parties are essentially arguing the December 13 contract acted as a novation—the substitution of a new contract for an old one which is thereby extinguished. *Ponze v. Guirl,* 794 S.W.2d 699, 702 (Mo.App.E.D.1990).

Regardless of the merits of this argument, reversing the court's order with respect to the May 26 contract, only, would have no effect on the relief awarded in the order. The award of damages was based on the December 13 contract as well and, as such, was proper. The court's judgment can be affirmed on that basis, irrespective of the May 26 contract. This argument is denied.

### (3)

■ The Layton/Rice Parties contend Meadowgreen breached the December 13 contract by refusing to close on lots 71 and 92 at the December 15, 1989, closing, despite the provision granting Green Valley the option to close on a lot-by-lot basis and Layton's agreement to close on those particular lots without an escrow.

There was no objective evidence of a request by Green Valley to close on lots 71 and 92 until the actual closing on all fourteen lots on December 15, 1989.[13] The December 13 contract provided:

Purchaser reserves the option to close on a lot to lot basis before the final closing of the remaining 14 lots.

The Meadowgreen Parties argue the provision's term "before the final closing of the remaining 14 lots" meant Green Valley's option to close on individual lots ended on December 14, 1989, the day before the scheduled closing date, and the parties had to close on all fourteen lots on December 15, 1989. The Layton/Rice Parties contend the option remained open and Green Valley had the right to close on lots 71 and 92 before the actual closing, up to *and including* December 15, 1989.

■ In interpreting the terms of a contract, we consider the contract's object, nature and purpose. *Title Ins. Co. of Minn. v. Constr. Escrow,* 675 S.W.2d 881, 889 (Mo. App.E.D.1984). We believe the Meadowgreen Parties' interpretation comes closer to the meaning and intent of the lot-by-lot provision. The contract provided for early individual closings presumably so Green Valley could obtain title to the lots without having to wait until the scheduled closing date to do so. Once the scheduled closing date arrived, Green Valley would obtain title to any lots the parties had not already closed on; there would no longer be any reason to close on a lot-by-lot basis. Time was of the essence. The parties had to close on *all* the lots on December 15, 1989.

■ If an interpretation of a contract yields unreasonable results, we reject that interpretation in favor of a reasonable construction. *Brown v. Brown,* 848 S.W.2d 551, 552 (Mo.App.E.D.1993). Under the Layton/Rice Parties' proposed interpretation of the lot-by-lot provision, Green Valley could have closed on individual lots up to the actual time of the closing, even five minutes prior to the closing. We do not believe this is what the provision was intended to mean. In any event, it is clear the parties were at the final closing on December 15, 1989, and Green Valley's option to close on individual lots

---

**13.** The Layton/Rice Parties claim Bill Rice and John Gorse discussed closing on these two lots prior to December 15, 1989. The only evidence of these conversations was Rice's testimony and notes Rice allegedly made during the conversations. Gorse denied ever discussing closing on lots 71 and 92 only. This evidentiary conflict was for the trial court to resolve.

ended. Meadowgreen was within its rights in refusing to close on lots 71 and 92 only.

(4)

The Layton/Rice Parties also contend the award of damages for breach of the December 13 contract erroneously included prejudgment interest and attorney's fees.

The trial court awarded $358,753.89 to Meadowgreen as damages for breach of the December 13 contract. This award was the sum of the following: (a) $211,120 in contractual damages, being the difference between $491,120, the contract price, and $280,000, the March 22, 1991, foreclosure sale price; (b) $111,108.08 in interest, being the sum of the interest accrued at nine percent on the $491,120 contract price from December 15, 1989, to March 22, 1991 ($55,251), and on the $211,120 in damages from March 22, 1991, until the date of judgment ($55,857.08); (c) $4,525.81 in property taxes; (d) $500 in property insurance premiums; and (e) $31,500 in attorney's fees.

■ The Layton/Rice Parties contend the trial court erred in awarding attorney's fees as part of the damages. Awards of attorney's fees are permitted only when called for by contract; when provided by statute; when incurred, as an item of damages, because of involvement in collateral litigation; or "when a court of equity finds it necessary to adjudge them in order to balance benefits." *Conley v. Rauschenbach,* 863 S.W.2d 617, 621 (Mo.App.E.D.1993). The Meadowgreen Parties claim they were entitled to attorney's fees under the last exception.

■ Attorney's fees are awarded to equitably balance benefits only if the party seeking the fees has demonstrated "very unusual circumstances" justifying an award of fees. *Osterberger v. Hites Const. Co.,* 599 S.W.2d 221, 230 (Mo.App.E.D.1980). "Very unusual circumstances" has been construed to mean an unusual type of case, or unusually complicated litigation. *Dugger v. Welp,* 646 S.W.2d 907, 909 (Mo.App.E.D.1983). The party seeking attorney's fees must show the legal actions taken by the parties significantly differ from other actions taken by other parties in similar situations, or by others trying to

achieve the same result. *Ohlendorf v. Feinstein,* 697 S.W.2d 553, 558 (Mo.App.E.D. 1985).

■ This Court is extremely reluctant to deviate from the "American Rule," which is that each litigant bears the expense of his or her own attorney's fees. *See Washington Univ. v. Royal Crown Bottling,* 801 S.W.2d 458, 468 (Mo.App.E.D.1990). In the cases cited above we upheld the trial court's denial of fees, or reversed the trial court's award of fees, on the ground the party seeking the fees had not sufficiently demonstrated circumstances so unusual as to warrant an award of attorney's fees on the ground of "very unusual circumstances." *See Conley,* 863 S.W.2d at 621; *Washington Univ,* 801 S.W.2d at 469; *Ohlendorf,* 697 S.W.2d at 558; *Dugger,* 646 S.W.2d at 909; *Osterberger,* 599 S.W.2d at 230. Attorney's fees are likewise not recoverable here. Pursuant to Rule 84.14, we modify the judgment so the damages awarded to the Meadowgreen Parties for breach of the Lilac Ridge contract are reduced by $31,500.

The Layton/Rice Parties also claim error regarding the trial court's award of prejudgment interest on the Meadowgreen Parties' breach of contract claim. The Layton/Rice Parties allege such interest cannot be awarded on "unliquidated claims," wherein the liable party does not know the amount he or she owes and who should therefore not be considered in default due to failure to pay.

■ This contention of error is without merit. RSMo § 408.020 provides for prejudgment interest "for all moneys after they become due and payable, on written contracts, . . . ." Prejudgment interest on an action for breach of a written contract runs from the date of breach, or the time when payment was due under the contract. *Wulfing v. Kansas City Southern Ind.,* 842 S.W.2d 133, 161 n. 16 (Mo.App.W.D.1992). The amount due Meadowgreen on December 15, 1989 ($491,120), and Meadowgreen's damages as of March 22, 1991 ($211,120), were both readily ascertainable with reference to the December 13 contract. The court properly assessed and awarded prejudgment interest.

(5)

■ The Layton/Rice Parties also allege error with respect to the trial court's judgment in favor of the Meadowgreen Parties, arguing John and Ann Gorse did not have standing, as individual shareholders of Meadowgreen, to receive a judgment in their favor on Meadowgreen's breach of contract claim against Green Valley.

■ We agree. Meadowgreen was the contracting party, not the Gorses. Shareholders cannot sue in their individual capacity for damages caused by the breach of a contract to which the corporation was a party. *Around the World Importing,* 795 S.W.2d at 91. The Gorses could only sue through the corporate entity. Further, there is no indication in the terms of the December 13 contract that the Gorses were intended to be third party beneficiaries of the contract. *See Dave Kolb Grading, Inc. v. Lieberman Corp.,* 837 S.W.2d 924, 939–940 (Mo.App.E.D. 1992). Pursuant to Rule 84.14, we modify the trial court's judgment on this claim so it is in Meadowgreen's favor only.

■ The Layton/Rice Parties also allege the trial court erred in finding against Joe and Carol Layton, Bill Rice, and Mican with respect to Meadowgreen's claim of breach of the December 13 contract. The Layton/Rice Parties contend only Green Valley was party to the contract, and only Green Valley should be liable thereon. We agree. "It is fundamental contract law that one cannot be liable for a breach of contract unless one is a party to that contract." *Electron Energy Corp. v. Short,* 408 Pa.Super. 563, 597 A.2d 175, 177 (1991). With respect to Joe Layton and Bill Rice, the directors of Green Valley, it is presumed that an agent is not personally bound and does not incur personal liability on contracts the agent enters into on behalf of a disclosed principal. *Kay v. Freeman,* 785 S.W.2d 90, 92 (Mo.App.W.D. 1990). The other parties—Carol Layton and Mican—were even farther removed from the December 13 contract.[14] Pursuant to Rule 84.14 we modify the trial court's judgment on this claim so it is against Green Valley only.

## C. *Unjust Enrichment*

■ The Layton/Rice Parties claim the trial court erred in finding for the Meadowgreen Parties on the latter's unjust enrichment claim. Without addressing the merits of the Layton/Rice Parties' arguments on appeal, we note the court did not, in fact, award damages on both the breach of contract claim and the unjust enrichment claim. Contrary to the Layton/Rice Parties' assertion, the trial court's order made only one award of $358,753.89 with respect to the Meadowgreen Parties' alternative theories of breach of contract and unjust enrichment. There was no doubling of damages. If the court's order is correct under any theory presented and supported by the evidence, we will affirm. *Trust Estate Under Last Will v. Welch,* 842 S.W.2d 567, 571 (Mo.App.E.D. 1992). The court's award is correct on the Meadowgreen Parties' breach of contract theory. We accordingly affirm.

## D. *Contempt*

The Layton/Rice Parties raise several contentions of error regarding the following finding by the trial court in its Court Order and Decree:

> The Court further finds each of Joseph Layton, Carol Layton, William Rice, Green Valley Construction Co., Inc. and Mican Homes, Inc., in contempt with respect to the Lilac Ridge real estate transaction and awards the Meadowgreen Parties $358,753.89.

■ Meadowgreen's claim for contempt was based on Green Valley's refusal to perform the December 13 contract despite three separate orders ordering Green Valley to perform the December 13 contract. Although the Meadowgreen Parties attempt, in their briefs, to characterize this order as one of criminal contempt, the contempt involved here was intended as a coercive means to compel a recalcitrant party to comply with the relief granted to the prevailing party and is therefore civil contempt. *International*

---

14. The case cited by the Meadowgreen Parties in response, *Downey v. United Weatherproofing,* 363 Mo. 852, 253 S.W.2d 976, 980–981 (1953), is not on point, as it involved tortious interference with contractual relations, not breach of contract.

*Motor v. Boghosian Motor,* 870 S.W.2d 843, 850 (Mo.App.E.D.1993). This is so even though performance of the contract was no longer possible after March 22, 1991, when Lemay Bank foreclosed on the deed of trust. Courts may levy a compensatory fine against the violator of a court order even if performance can no longer be obtained, if the fine is related to the actual monetary loss sustained by the injured party and is payable to that party. *See id.*

That being said, we are obligated to consider, *sua sponte,* the propriety of our jurisdiction over the contempt order, even though neither party raises it as an issue. *Saeuberlich v. Saeuberlich,* 782 S.W.2d 78, 80 (Mo.App.E.D.1989). An order finding a party in contempt is interlocutory in nature and is not appealable until it has been enforced. *Hamilton v. Hamilton,* 661 S.W.2d 82, 83 (Mo.App.E.D.1983). A judgment of contempt ordering the payment of a fine to coerce compliance with a court order or to remedy noncompliance is not appealable until the party asking for contempt enforces the fine by executing on it. *See City of Pagedale v. Taylor,* 790 S.W.2d 516, 518 (Mo.App.E.D. 1990).

The record before us fails to show any attempt to execute on the court's order of contempt; therefore, the order is interlocutory and not appealable. We accordingly dismiss, without prejudice, the Layton/Rice Parties' points on appeal regarding the trial court's finding of contempt.[15]

### E. *Vendor's Liens*

The Layton/Rice Parties contend on appeal that the trial court erred in imposing vendor's liens on the sixteen Lilac Ridge lots in Mican's possession at the time of trial. Four of these lots—63, 65, 88 and 95—were part of the fifteen lots purchased by Green Valley at the June 30, 1989, closing. The Layton/Rice Parties argue Meadowgreen received full value for these lots, and could not impose a vendor's lien against them. In response, the Meadowgreen Parties claim they may assert a lien on any of the lots in the control of the Layton/Rice Parties.

"An equitable lien is premised upon what is considered fair and just in each case." *Community Bank v. Campbell,* 870 S.W.2d 838, 842 (Mo.App.W.D.1993). An equitable vendor's lien is an equitable security which arises from an executed conveyance of land on which the purchaser has not paid the full purchase price, and is based on the principle that is wrong to retain lands of another without paying the purchase price. *Mollett v. Beckman,* 78 S.W.2d 886, 890 (Mo.App.St. L.1935); *Hartog v. Siegler,* 615 S.W.2d 632, 639 (Mo.App.E.D.1981).

The four lots referred to by the Layton/Rice Parties here were part of an overall transaction for the sale of twenty-nine Lilac Ridge lots. Green Valley did not pay the full consideration due on all the lots. We see no reason why vendor's liens may not be imposed on these four lots. This point is denied.

The other twelve lots—lots 72, 73, 75, 76, 77, 78, 80, 82, 83, 84, 92, and 93—were part of the fourteen lots Green Valley was supposed to purchase at the December 15, 1989, closing.[16] With respect to these lots, the Layton/Rice Parties argue Lemay Bank's foreclosure extinguished any liens created by the contract between Meadowgreen and Green Valley.

---

15. In any event, we note several of the Layton/Rice Parties' challenges to the trial court's contempt award are without merit. The contempt action was not an attempt to enforce a money judgment and therefore barred by RSMo § 511.340; the action for contempt was intended to force Green Valley to perform its obligations under the December 13 contract and close on the Lilac Ridge lots. Further, the court's award (including the attorney's fees) was related to the actual damages suffered by the Meadowgreen Parties from Green Valley's refusal to close, was intended to compensate Meadowgreen for that

loss, and thus was appropriate. *See Smith v. Smith,* 743 S.W.2d 476, 479 (Mo.App.S.D.1987). Finally, the court did not err in finding against Joe Layton, Carol Layton, and Bill Rice, the parties who controlled Green Valley, as each participated in and/or induced Green Valley's contemptuous conduct. *See State ex rel. Girard v. Percich,* 557 S.W.2d 25, 37 (Mo.App.St.L.D. 1977).

16. By the time of trial, lots 71 and 79 had been sold to other parties.

In *Stanovsky v. Group Enterprise & Const. Co.*, 714 S.W.2d 836 (Mo.App.E.D. 1986), this Court reversed the trial court's denial of a vendee's lien [17] after the lot in question had been foreclosed upon, and then purchased, by the defendant bank. After noting that persons who acquire property as innocent purchasers for value take such property free of any equitable liens, we held the defendant was not an innocent purchaser for value since it knew of the plaintiffs' sale contract, payment of earnest money, and inchoate lien interest when it entered into the deed of trust with the owner of the lot. *Id.* at 838–839. Further, we held the lien enforceable against a couple who purchased this lot from the defendant bank after the plaintiffs had filed their action. *Id.* at 839.

"The burden of proving status as an innocent purchaser is upon the party claiming that status." *Id.* An innocent, bona fide purchaser is one "who pays a valuable consideration, has no notice of outstanding rights of others, and who acts in good faith." *Community Bank,* 870 S.W.2d at 842. Contrary to the Layton/Rice Parties' assertions, it is clear that Mican was not an innocent purchaser for value. Mican acquired these lots after Meadowgreen had filed its action against Green Valley for the breach of the contract for the sale of those lots. Bill Rice and Joe Layton, Mican's directors, were also the directors of Green Valley and party to the Lilac Ridge transaction.

The Layton/Rice Parties point out that, unlike *Stanovsky,* Lemay Bank's deed of trust on the Lilac Ridge lots predated the contract for the sale of those lots. They refer us to *Bragg v. Ross,* 349 Mo. 511, 162 S.W.2d 263, 267 (1942), which holds that implied vendor's liens subordinate to prior mortgages or deeds of trust are extinguished when such mortgages or deeds of trust are foreclosed. However, in *Bragg,* the foreclosure occurred *through no fault of the defendant. Id.* In denying the plaintiff an equitable vendor's lien, the Missouri Supreme Court suggested that a vendor's lien may be revived or kept alive even after fore-

closure on a superior mortgage, if the purchaser fails to perform an obligation of his or her own with respect to that debt. *Id.*

Here, the Layton/Rice Parties refused to perform their contractual obligation with respect to the Lilac Ridge lots, even after Meadowgreen obtained three separate court orders ordering them to do so. This refusal to perform the December 13 contract directly caused the foreclosure on the deed of trust and Meadowgreen's loss of those lots. The Layton/Rice Parties then obtained nearly all the lots from Lemay Bank at lower prices, despite their professed concern prior to foreclosure that the lots did not meet St. Louis County specifications. We will not countenance the Layton/Rice Parties' use of Lemay Bank's foreclosure on the Lilac Ridge lots to avoid the imposition of equitable vendor's liens, when they, by their actions, caused the foreclosure and benefitted from it.

A court of equity has the power to impose a lien on property as a means of securing the collection of debt relating to that property, if necessary to prevent injustice. *Stanovsky,* 714 S.W.2d at 838. On the facts here, we see no error in the trial court's imposition of a vendor's lien on lots 72, 73, 75, 76, 77, 78, 80, 82, 83, 84, 92, and 93 of Lilac Ridge. We accordingly affirm.

## IV.

### THE SUMMERHEDGE CONTRACT

#### A. *Factual Background*

By contract dated August 4, 1988, Meadowgreen, as seller, agreed to convey to Summerhedge, as purchaser, lots 19 through 39 of Summerhedge Subdivision ("the Summerhedge contract"). Summerhedge was to pay Meadowgreen $18,286 per lot, or $384,000. The Summerhedge contract provided that Meadowgreen would be paid as each of the lots were sold by Summerhedge to Tracey Rufkahr and Brent A. Platt pursuant to a preexisting sales contract for lots 8 through 47 and lots 49 through 57 of Summerhedge

---

**17.** While *Stanovsky* involved a vendee's lien rather than a vendor's lien, the two are mirror images of each other, and the same principles apply. *Id.* at 838.

Subdivision ("the Rufkahr/Platt contract").[18] Also on August 4, 1988, Joe Layton and John Gorse entered into an agreement in which Gorse was to be paid $384,000 by Meadowgreen out of the proceeds of the sales of lots 19 through 39 to Summerhedge. Meadowgreen transferred all of its right, title and interest in Summerhedge Subdivision to Summerhedge by means of a quitclaim deed recorded August 11, 1988.

On August 24, 1988, the first of three closings scheduled by the Rufkahr/Platt contract took place. Lots 22 through 27 and lots 34 through 37 of Summerhedge Subdivision—ten lots previously owned by Meadowgreen—were conveyed by Summerhedge to Rufkahr/Platt. $182,860 was due Meadowgreen under the Summerhedge contract. Summerhedge paid Meadowgreen $130,000 by check dated August 26, 1988, and also paid off a $29,729.93 deed of trust. A shortfall of $23,130.07 remained.

On December 1, 1988, the second closing under the Rufkahr/Platt contract took place. Summerhedge transferred lots 14 through 21 and lots 42, 44 and 45 of Summerhedge Subdivision to Rufkahr/Platt. Meadowgreen had previously owned lots 19, 20, and 21. The $54,858 due Meadowgreen for these three lots was never paid. No further closings under the Rufkahr/Platt contract occurred. Summerhedge retained the remaining eight lots listed in the Summerhedge contract—lots 28–33, 38, and 39—but made no further payment. In sum, only $159,729.93 of the $384,000 due under the Summerhedge contract was paid.

On September 21, 1989, Meadowgreen filed Cause No. 600484 against Summerhedge. In the first two counts, Meadowgreen sought (1) damages for breach of the Summerhedge contract, and (2) vendor's liens on the eight Summerhedge Subdivision lots still in Summerhedge's possession.[19]

Nearly two years later, on August 11, 1991, Meadowgreen filed a notice of lis pendens with respect to lots 19–39 of Summerhedge Subdivision. By the time this notice was filed, Rufkahr/Platt had transferred its interest in lots 19–26 of Summerhedge Subdivision to Mican; Summerhedge had transferred the eight lots it retained (lots 28–33, 38, 39) to Mican; and lots 27 and 37 had been sold to other parties. Mican's motion to set aside the notice of lis pendens was denied. Also in 1991, Mican and Meadowgreen entered into an escrow agreement, wherein the parties agreed to put the gross proceeds earned by Mican from the sales of any of these lots into an escrow account pending the resolution of this dispute. The Meadowgreen Parties contended at trial that Summerhedge was violating this escrow agreement; Joe Layton disputed this, testifying he understood "gross proceeds" to mean whatever was left over after loans, expenses and other costs were paid.[20]

In its Court Order and Decree, the trial court found in favor of the Meadowgreen Parties and against Summerhedge on Meadowgreen's claim of breach of the Summerhedge contract and awarded the Meadowgreen Parties damages in the amount of $224,276.07. The court further granted a vendor's lien on Lots 19–26, 38 and 39 of the Summerhedge subdivision "to secure the full and final payment of the judgment."

### B. Prejudgment Interest

The Meadowgreen Parties claim the trial court erred in failing to award prejudgment interest on their claim of breach of the Summerhedge contract. The court awarded the Meadowgreen Parties $224,270.07[21]—the difference between the contract price ($384,000) and what was paid to Meadowgreen on the contract ($159,729.93)—but no interest. As with the Lilac Ridge transactions, the claim

18. The Summerhedge contract further provided that payments to Meadowgreen would begin once Summerhedge had received at least $399,000 on the Rufkahr/Platt contract. There was no dispute that Summerhedge had received this $399,000 sum.

19. The third and fourth counts, money had and received and trespass, are addressed above.

20. Compare this to his demand at the December 15, 1989, closing for an escrow of the full purchase price due under the December 13 contract.

21. The court's award of $224,276.07 in damages appears to be a typographical error.

here was a contractual claim for a readily ascertainable amount, and RSMo § 408.020 applied. If this were an action at law, this point would be well taken. *See Huffstutter*, 778 S.W.2d at 395.

However, this suit was in equity, and as noted above in our discussion of the trial court's denial of prejudgment interest with respect to the action for return of the $75,000 paid to Summerhedge, the determination of whether to award prejudgment interest in equitable actions is left to the trial court's discretion. *Vogel*, 741 S.W.2d at 872. The court's failure to award prejudgment interest on Meadowgreen's action for breach of the Summerhedge contract is reversible only for an abuse of discretion, which we do not find. This point is denied.

## C. *Standing*

For their part, the Layton/Rice Parties allege as error the fact that John and Ann Gorse, as members of "the Meadowgreen Parties," received judgment in their favor on Meadowgreen's claim of breach of Summerhedge contract. According to the Layton/Rice Parties, John and Ann Gorse did not have standing to receive a judgment in their favor.

We disagree. Unlike the Lilac Ridge transaction, there was clear evidence here that John Gorse was intended to be a third party beneficiary on the Summerhedge contract: namely, the August 4, 1988, agreement between John Gorse and Joe Layton entered into in conjunction with the Summerhedge contract. This agreement between the principals of the contracting parties provided that Gorse would be personally compensated from the proceeds of the sales of the Summerhedge lots listed in the contract. It is fair to say the agreement intended Ann Gorse, as John Gorse's wife, to share in the proceeds as well. Thus, the finding in favor of all the Meadowgreen Parties with respect to the Summerhedge contract was proper.

## D. *Vendor's Liens*

The Layton/Rice Parties also challenge the imposition of vendor's liens on lots 19–26 of Summerhedge Subdivision, the lots Mican received from Rufkahr/Platt, who had bought the lots from Summerhedge. According to the Layton/Rice Parties, Rufkahr/Platt were "innocent purchasers for value" who took the lots with Meadowgreen's approval under the Summerhedge contract.

Meadowgreen acquired an equitable lien at the time it conveyed lots 19–26 to Summerhedge. Summerhedge, in turn, conveyed the lots to Rufkahr/Platt, who eventually conveyed them to Mican. Regardless of Rufkahr/Platt's status, it is clear Mican was not an innocent purchaser for value. Mican acquired these lots after the Summerhedge contract, the basis for the equitable vendor's liens, had been breached, and Meadowgreen's cause of action for the breach had been filed. Joe Layton signed the contract on behalf of Summerhedge, and as one of the two directors of Mican, it was reasonable to assume he was aware of the Summerhedge contract and Meadowgreen's inchoate lien interest in the Summerhedge Subdivision lots. *See Stanovsky*, 714 S.W.2d at 839. The imposition of vendor's liens on lots 19–26 of Summerhedge Subdivision was permissible, and we affirm.

The Meadowgreen Parties complain of the trial court's failure to impose vendor's liens on lots 28–36 of Summerhedge Subdivision, which had been retained by Summerhedge and later transferred to Mican. The Meadowgreen Parties argue these lots were erroneously omitted from the court's order, probably inadvertently.[22] We see no reason why vendor's liens should not be imposed on these lots. Pursuant to Rule 84.14, we modify the court's judgment to impose vendor's liens on lots 28–36 of Summerhedge Subdivision.

## V.

## CONCLUSION

Cause is dismissed with respect to the Layton/Rice Parties' challenge to the award

22. After judgment was entered, the Meadowgreen Parties filed, and the court denied, a "Motion for Correction of Clerical Mistakes in Order and Decree and to Amend the Judgment" alleging the court erroneously left these lots off the judgment.

of contempt damages. The Court Order and Decree is otherwise affirmed as modified.[23]

SMITH, P.J. and RHODES RUSSELL, J., concur.

**23.** The Layton/Rice Parties have moved to strike certain references from the Meadowgreen Parties' briefs. This motion is granted. The Meadowgreen Parties' statement of facts refer to events occurring after entry of the trial court's judgment. These events were never presented to the trial court and may not properly be considered on appeal. *Henry v. Henry*, 886 S.W.2d 172, 175 (Mo.App.E.D.1994). Further, the Meadowgreen Parties included in the appendix to their brief a copy of a bankruptcy order. This order was included in the appendix as an original exhibit, in contravention of this Court's Special Rule 365. Appendices failing to comply with this rule may be stricken. We accordingly strike that part of the appendix to the Meadowgreen Parties' brief.